# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 21, 2016

Plaintiff-Appellee,

v

No.  326287
Wayne Circuit Court
LC No.  14-007134-01-FC

TIMOTHY FITZGERALD TENNILLE,

Defendant-Appellant.

Before:  SHAPIRO, P.J., and HOEKSTRA and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of second-degree murder, MCL 750.317, armed robbery, MCL 750.529, and possession of a firearm during the commission of a felony, MCL 750.227b(1).  The trial court sentenced defendant to 54 years and 8 months to 90 years' imprisonment for the murder and armed robbery convictions, to be served concurrently, and to a term of 2 years' imprisonment for the felony-firearm conviction, to be served consecutively to the murder and armed robbery sentences.  Because the trial court did not err by denying defendant's motion to suppress defendant's statements and the prosecutor did not commit misconduct during closing arguments, we affirm.

## I.  FACTS

This case stems from a fatal shooting on October 25, 2012.  On that date, the victim, Demetrius Cole, attended a relative's wedding reception in Detroit.  After the reception, Cole was in the parking lot outside of the event hall while family members loaded items into a large van.  A shooting then occurred, during which Cole sustained a fatal gunshot wound to the chest.  None of Cole's family members testifying at trial actually saw the shooting or saw defendant at the scene.

However, Cole was in possession of a gun that evening, and there was evidence that he fired on his assailants.  Shortly after the shooting, defendant sought medical treatment for a gunshot wound to his hand.  When questioned by police on November 10, 2012, defendant initially claimed that he had been shot when a man tried to steal his cell phone.  However, in a second interview on November 11, 2012, defendant confessed to his involvement in Cole's

-1-

death, informing police of a plan to steal Cole's watch. Defendant told police that this plan involved two other men.[1] According to defendant, Cole fired during the attempted robbery, at which time one of the other men shot Cole. Defendant's videotaped police interviews were admitted into evidence at his trial and viewed by his jury.

The jury convicted defendant as noted above. Defendant now appeals as of right.

## II. ADMISSION OF DEFENDANT'S POLICE STATEMENT

Defendant first argues that the trial court erroneously denied his motion to suppress his inculpatory statements that he made during the second custodial interview, during which he admitted his involvement in the armed robbery. Defendant argues that he was not re-advised of his *Miranda*[2] rights before giving the inculpatory statements and that he was experiencing pain from the gunshot wound to his hand. In these circumstances, defendant contends that his statements should have been suppressed because he did not voluntarily relinquish his constitutional rights and his statements were the product of impermissible police coercion. We disagree.

We review de novo the entire record regarding defendant's motion to suppress his statement, but we will not disturb a trial court's factual findings unless clear error exists. *People v Daoud*, 462 Mich 621, 629; 614 NW2d 152 (2000). The prosecution has "the burden of proving by a preponderance of the evidence that there was a valid waiver of the suspect's rights." *People v Abraham*, 234 Mich App 640, 645; 599 NW2d 736 (1999).

"The Fifth Amendment and Const 1963, art 1, § 17 provide that no person shall be compelled to be a witness against himself in a criminal trial." *People v Schollaert*, 194 Mich App 158, 164; 486 NW2d 312 (1992); US Const, Am V; Const 1963, art 1, §17. To protect a suspect's constitutional privilege against self-incrimination, the accused must be given the now-familiar *Miranda* warnings before being subjected to custodial interrogation. *People v Tanner*, 496 Mich 199, 207; 853 NW2d 653 (2014); *Daoud*, 462 Mich at 624 n 1. "Statements of an accused made during a custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his or her Fifth Amendment rights." *People v Henry*, 305 Mich App 127, 144; 854 NW2d 114 (2014) (quotation omitted). Courts apply a two-part inquiry to determine whether a *Miranda* waiver is valid:

> First, the relinquishment of the right must have been "voluntary," in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances

---

[1] Codefendants Kevin Clark and DeMarco Carter were both charged with felony murder and armed robbery. Clark and Carter were found not guilty of all charges.

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [*Id.*, quoting *Moran v Burbine,* 475 US 412, 421; 106 SCt 1135; 89 LEd2d 410 (1986).]

"[W]hen a suspect has been afforded *Miranda* warnings and affirmatively waives his *Miranda* rights, subsequent incriminating statements may be used against him." *Tanner*, 496 Mich at 209.

Moreover, once a defendant has been apprised of his rights and validly waived those rights, the police are not necessarily required to re-read the *Miranda* warning every time that the defendant is questioned. See *People v Littlejohn*, 197 Mich App 220, 223; 495 NW2d 171 (1992); *People v Godboldo*, 158 Mich App 603, 605-607; 405 NW2d 114 (1986); see also *Berghuis v Thompkins*, 560 US 370, 386; 130 S Ct 2250; 176 L Ed 2d 1098 (2010) ("Police are not required to rewarn suspects from time to time."). "[T]he *Miranda* rights are not a liturgy which must be read each time a defendant is questioned. The *Miranda* rule is not in itself a constitutional right, but rather is only a procedural safeguard designed to protect an individual's Fifth Amendment privilege against self-incrimination." *Godboldo*, 158 Mich App at 605. Accordingly, absent some intervening circumstance which would necessitate a rewarning of the defendant, *People v Ray*, 431 Mich 260, 276; 430 NW2d 626 (1988), "the failure to reread a defendant's *Miranda* rights prior to each interrogation does not render [a defendant's] subsequent statements inadmissible as evidence against him." *Godboldo*, 158 Mich App at 607. Instead, "the only question is whether, viewing the 'totality of the circumstances,' the defendant's statement was voluntary." *Id.* at 606 (citation omitted); see also *Ray*, 431 Mich at 276.

Whether a defendant voluntarily waives his constitutional rights and makes a voluntary statement "depends on the absence of police coercion." *Daoud*, 462 Mich at 635. See also *People v Tierney*, 266 Mich App 687, 707; 703 NW2d 204 (2005). "The test of voluntariness should be whether, considering the totality of all the surrounding circumstances, the confession is 'the product of an essentially free and unconstrained choice by its maker,' or whether the accused's 'will has been overborne and his capacity for self-determination critically impaired[.]'" *People v Cipriano*, 431 Mich 315, 333-334; 429 NW2d 781 (1988) (citation omitted).

In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id.* at 334.]

"No single factor is necessarily conclusive on the issue of voluntariness, and 'the ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the

confession indicates that it was freely and voluntarily made,"' rather than the product of coercion, intimidation, or deception. *People v Akins*, 259 Mich App 545, 564-565; 675 NW2d 863 (2003), quoting *Cipriano*, 431 Mich at 334.

In this case, police first interrogated defendant in an interview room at a police facility on November 10, 2012, which was 16 days after he was shot in the hand and well after he received medical treatment for his injury. The record discloses, and defendant does not dispute, that the officers properly advised him of his *Miranda* rights on November 10, 2012. In particular, after confirming that he could read and write, defendant read his rights aloud to police from an advice of rights form, he acknowledged that he understood those rights, he initialed next to each right on the form, and he then signed the advice of rights form. Having been fully informed of his constitutional rights, defendant made no effort to invoke his rights and instead freely answered the officers' questions.

During this first interview, defendant made a few comments about pain in his hand and asked about his medication, but he also assured the officers more than once that he was able to continue speaking with them. Moreover, defendant did not implicate himself in Cole's death during this first interview, but instead told police that he was shot when someone tried to steal his cell phone. Eventually, after a little more than an hour, after defendant indicated that his hand "hurts so bad," the police discontinued the interview so that defendant could receive pain medication. At the close of the interview, the officers told defendant that they would finish speaking with him "tomorrow morning" to get more information from him. One of the officers indicated that it was up to defendant whether to speak with them, and defendant again acknowledged that he understood his constitutional rights.

The following day, approximately 14 hours after the conclusion of the first interview, the same two officers again spoke with defendant at the police station. They did not reiterate defendant's constitutional rights at the beginning of the second interview. By this time, defendant had received his medication and he told police that his hand was feeling better. In response to police questioning, defendant eventually implicated himself in Cole's death, acknowledging his role in a plan to steal Cole's watch.

Considering the totality of the circumstances surrounding defendant's waiver of his constitutional rights and his statement to police, we find no merit to defendant's assertion that pain in his hand rendered his statement involuntary. Contrary to defendant's argument, there is no evidence that the police coerced defendant by taking advantage of his pain to compel a confession. Nor is there any indication that defendant's pain hindered his ability to understand the proceedings and to voluntarily participate in the interviews. Defendant sustained his injury a full 16 days before the first interview, and although he had received medical treatment for his hand, he was not hospitalized at the time of the interviews. Further, while defendant may have been experiencing some lingering pain at the time of the first interview, he repeatedly assured police that he could continue the conversation. Defendant was alert and cooperative. He was able to understand and answer the officers' questions in a logical and coherent manner. Notably, defendant did not incriminate himself during this first interview, but was able to relate a story regarding how he got shot, which belies any claim that he was overborne by pain or that his capacity for self-determination was critically impaired. *Cipriano*, 431 Mich at 333-334. Moreover, the fact that the officers discontinued the first interview after a little over an hour, so

that defendant could rest and get his medication, confirms the absence of coercive or deceptive conduct. Then, by the time of the second interview, defendant had taken his medication, and defendant indicated that his hand was feeling better. On this record, considering the totality of the circumstances, any pain defendant may have experienced during the first interview did not render the waiver of his rights involuntary nor did it prevent him from making a voluntary statement.[3]

Given the facts of this case, we also conclude that the officers were not required to re-warn defendant at of his *Miranda* rights at the second interview, and their failure to do so did not render defendant's statement involuntary. Only 15 hours passed between the time defendant was initially advised of his *Miranda* rights and the second police interview. Both interviews were conducted by the same officers at the same facility and defendant remained in police custody overnight. Indeed, at the conclusion of the first interview, the officers told defendant that they would be back to get more information from him in the morning and defendant again confirmed his understanding of his constitutional rights. On these facts, despite the passage of time, there is no evidence than anything occurred overnight that would have "nullified or in any way diminished" defendant's understanding of the warnings given him the previous day. See *United States v McNeil*, 106 Fed App'x 294, 301 (CA 6 2004) (24 hour delay between police interviews did not require new *Miranda* warnings). To the contrary, when speaking with his mother during the second interview, defendant described the advice of rights form he signed the previous day and repeated several of the rights to his mother, thereby demonstrating his continued understanding of those rights. On this record, there were no intervening circumstances indicating that a serious change occurred between the *Miranda* warnings and the second interview such that his waiver was no longer knowing or voluntary or that his *Miranda* rights no longer applied. See *Ray*, 431 Mich at 276-277; see also *Treesh v Bagley*, 612 F3d 424, 432 (CA 6 2010). Consequently, the officers' failure to repeat defendant's rights at the beginning of the

---

[3] We note that defendant's situation is easily distinguished from that in *Mincey v Arizona*, 437 US 385, 398; 98 S Ct 2408, 2416; 57 L Ed 2d 290 (1978) and other cases cited by defendant for the proposition that pain during an interview may render a statement involuntary. For example, in *Mincey*, the defendant:

> had been seriously wounded just a few hours earlier, and had arrived at the hospital "depressed almost to the point of coma," according to his attending physician. Although he had received some treatment, his condition at the time of [the] interrogation was still sufficiently serious that he was in the intensive care unit. He complained to [police] that the pain in his leg was "unbearable." He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent. Finally, while [the defendant] was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus. He was, in short, "at the complete mercy" of [police], unable to escape or resist the thrust of [the] interrogation. [*Id.*]

second interview does not require suppression of his voluntary statement. See *Godboldo*, 158 Mich App at 605-607.

## III. PROSECUTORIAL MISCONDUCT

Defendant also claims that the prosecutor impermissibly denigrated defense counsel by referring to portions of defense counsel's closing argument as a "smokescreen," thereby accusing defense counsel of attempting to mislead the jury. We disagree.

Defendant failed to preserve this issue for our review by objection before the trial court. Our review of unpreserved errors is limited to plain error affecting substantial rights, i.e., "outcome-determinative, plain error." *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). "'Further, we cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect.'" *Id.*, quoting *People v Callon,* 256 Mich App 312, 329-330; 662 NW2d 501 (2003).

"We review claims of prosecutorial misconduct case by case, examining the remarks in context, to determine whether the defendant received a fair and impartial trial." *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001) (citations omitted). "Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial." *Unger*, 278 Mich App at 236 (citation omitted). "They are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Id.* (citation omitted). "However, a prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury." *Id.* (quotation omitted). Nevertheless, "[a]n otherwise improper remark may not rise to an error requiring reversal when the prosecutor is responding to the defense counsel's argument." *Id.* at 238 (quotation omitted).

In this case, the prosecutor's reference to a "smokescreen" during rebuttal in response to defense counsel's argument did not deny defendant a fair and impartial trial. The challenged prosecutorial comments at issue involve the testimony of two prosecution witnesses, Karen Curry and Antoine Friday, who were present at the scene of the shooting. During defense counsel's closing argument, defense counsel challenged the relevance of Curry's testimony and attacked Curry's credibility by highlighting inconsistencies in her testimony. Counsel also disputed Friday's credibility, questioning among other things why he would call Cole to attend the reception at the last minute, even though Cole had not been invited beforehand. In response, during rebuttal argument, the prosecutor referred to defense counsel's arguments with respect to these witnesses as "smokescreens," arguing that the jury's focus should instead be on defendant's own statements, which directly implicated defendant as a participant in the robbery and murder.

Viewing the challenged prosecutorial comments in light of defense counsel's closing argument, defendant is not entitled to relief. As a rebuttal to defense counsel's closing argument, the prosecutor merely urged the jury to focus on defendant's confession, rather than the inconsistencies emphasized by defense counsel in the testimony offered by Friday and Curry. In context, this was not an improper response to defense counsel's argument. Cf. *Watson*, 245 Mich App at 592-593. Further, even assuming some impropriety by the prosecutor, any prejudicial effect of the challenged comments was minimal and could have been alleviated by a

timely objection and an appropriate curative instruction. *Callon*, 256 Mich App at 329-330. Indeed, the trial court instructed the jury that the lawyers' statements, arguments, and commentary are not evidence and that the jury "should only accept the things the lawyers say that are supported by the evidence, or by your own common sense and general knowledge." "[J]urors are presumed to follow their instructions." *Unger*, 278 Mich App at 237. Thus, reversal is not warranted on defendant's claim of prosecutorial misconduct.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Joel P. Hoekstra
/s/ Amy Ronayne Krause