**UNITED STATES of America,**
**Plaintiff,**

v.

**Clifford SQUARE, Defendant.**

**Case No. 1:10CR00492.**

United States District Court,
N.D. Ohio,
Eastern Division.

May 16, 2011.

Kelly L. Galvin, Office of the U.S. Attorney, Cleveland, OH, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

SARA LIOI, District Judge.

■ This matter is before the Court upon Defendant Clifford Square's objections and motion to reconsider[1] (Doc. 46) a portion of the Magistrate Judge's Report and Recommendation ("R & R") filed March 29, 2011 (Doc. 39), concerning defendant's motion to suppress (Docs. 21, 25). The government has filed a response to Defendant's objections and motion to reconsider. (Doc. 50.) This matter is ripe for determination.

## I. Introduction

Defendant filed his motion to suppress (Docs. 21, 25), which was referred to Magistrate Judge George J. Limbert. (Doc. 23). Magistrate Judge Limbert held an evidentiary hearing (Doc. 29) on Defendant's Motion to Suppress and issued his R & R recommending that Defendant's

---

1. The Federal Rules of Criminal Procedure do not provide for a motion to reconsider. The Sixth Circuit, however, has held that a motion to reconsider may be treated under Rule 59(e) of the Federal Rules of Civil Procedure as a motion to alter or amend a *judgment. United States v. Percy,* No. 1:01cr278, 2007 WL 275969, at *1 (Jan. 25, 2007) (citing *Smith v. Hudson,* 600 F.2d 60, 62–3 (6th Cir.1979)) (emphasis added). Although a magistrate judge is authorized to preside at an evidentiary hearing on a motion to suppress evidence and is authorized to make *proposed* findings of fact, conclusions of law and a *proposed* order, the district court must make the *final adjudication* on the motion. *Campbell v. U.S. Dist. Court for N. Dist. of California,* 501 F.2d 196, 206 (9th Cir.1974), *cert. denied,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974) (emphasis added). Prior to the rulings herein, this Court had not yet accepted, rejected or modified the R & R or otherwise made a final adjudication on the motion. There being no final judgment on Defendant's motion to suppress, his motion to reconsider is premature. The Court thus construes Defendant's motion to reconsider as an objection to the R & R.

motion be granted in part and denied in part. (Doc. 39.)

Defendant timely filed objections to the portion of the R & R relating to statements he made during an interviewed conducted by Detective Alexander after his arrest. (Doc. 46.) The Government responded to defendant's objections. (Doc. 50.)

Having reviewed Defendant's objections, the Government's response and the entire record, the Court is now prepared to rule on this matter. For the reasons set forth below, the defendant's objections are **OVERRULED,** and the Court hereby **ACCEPTS and ADOPTS** Magistrate Judge Limbert's R & R.

## II. ANALYSIS

■■■ When a party timely objects to a magistrate judge's report and recommendation on a motion to suppress, a district court must conduct a de novo review of those portions of the report and recommendation to which objection is made. *See, United States v. Curtis,* 237 F.3d 598, 603 (6th Cir.2001) (holding that a magistrate judge's ruling on "dispositive" motions, such as those for the suppression of evidence, must be reviewed de novo by the district court); 28 U.S.C. § 636(b)(1) (providing that a district judge "shall make a de novo determination of those portions of the magistrate judge's report to which objection is made"). De novo review requires at least a review of the evidence before the Magistrate Judge; the Court may not act solely on the basis of a Magistrate Judge's Report and Recommendation. *Hill v. Duriron Co.,* 656 F.2d 1208, 1215 (6th Cir.1981). The Court may receive further evidence, but is not required to do so. 28 U.S.C. § 636(b)(1)(C); *United States v. White,* 295 F.Supp.2d 709, 712 (E.D.Mich.2002) (citing 12 Fed. Prac. & Proc. Civ. § 3070.2).

Defendant's objection asserts that the portion of the R & R denying his motion to suppress statements he made during an interview with Detective Alexander after his arrest should be overruled because a video recording of that interview reveals that Detective Alexander did not advise him that he had the right to terminate questioning at any time. Defendant argues, therefore, that his Miranda waiver was not knowing and intelligent because, by failing to offer the aforementioned instruction, Detective Alexander did not ensure that he knew "that he may choose . . . to discontinue talking at any time." *Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). Defendant further argues that his waiver was not knowing and voluntary because Detective Alexander advised him of his rights in a hasty matter. Defendant did not advance these arguments either in his motion to suppress or before Magistrate Limbert at the evidentiary hearing, despite the availability of the videotape at hearing.

■■■ While not addressed in the parties' filings, the Court finds that Defendant has waived his arguments. In *United States v. Howell,* the Ninth Circuit held that a district court does not abuse its discretion in refusing to consider supplemental factual allegations that a defendant did not present to the magistrate judge despite their availability at that time, but which defendant instead introduces for the first time in an objection to the R & R. 231 F.3d 615 (9th Cir.2000) ("[A] district court has discretion, but is not required, to consider evidence presented for the first time in a party's objection to a magistrate judge's recommendation.").

■■■ Although, the Sixth Circuit "has not squarely addressed whether a party may raise new arguments before a district judge that were not presented to the magistrate," it has indicated in several cases

that "a party's failure to raise an argument before the magistrate judge constitutes a waiver." *United States v. Ault*, No. 1:10cr20, 2011 WL 539710, at *2 (E.D.Tenn. Feb. 4, 2011) (quoting *The Glidden Co. v. Kinsella*, 386 Fed.Appx. 535, 544 & n. 2 (6th Cir.2010)) (citing *Murr v. United States*, 200 F.3d 895, 902 n. 1 (6th Cir.2000)). *See also, Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.2001) (citing *Murr*); *United States v. Hammond*, 234 F.3d 1270 (6th Cir.2000) (citing *Murr*); *United States v. Waters*, 158 F.3d 933, 936 (6th Cir.1998). Absent an indication of "any special circumstances ... that would make reconsidering this general rule appropriate," a Court need not consider an argument that the Defendant failed to present to the magistrate judge. *Ault*, 2011 WL 539710, at *2.

No such special circumstances are present in this case; therefore, Defendant has waived his arguments. Counsel for Defendant concedes that the Government made an electronic version of the videotaped statements available via email prior to the suppression hearing. However, defense counsel asserts she was unable to open and view the email attachment. Nevertheless, there is no indication that defense counsel asked the Government to provide her with a copy of the video in an alternate format, or that if such a request was made it was refused by the Government. Counsel for the Defendant also concedes that the Government offered to play the videotape at the suppression hearing, but due to the lateness of the hour and concerns of delay, defense counsel declined the offer. (Doc. 46 at 4, n. 1.) The Court is therefore not required to consider this evidence or Defendant's new arguments.

Even if the Court were to consider the argument that—because Detective Alexander read Mr. Square his rights in a hasty manner and did not instruct him that he could terminate the interview at any time,

Mr. Square did not knowingly and voluntarily waive his Miranda rights—that argument is without merit. Moreover, rather than supporting Defendant's argument, the videotape lends further support for Magistrate Judge Limbert's finding that the Mr. Square knowingly and voluntarily waived his Miranda rights.

■ In *Miranda v. Arizona*, the Supreme Court prescribed the following four now familiar warnings:

[A suspect] must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.".

*Florida v. Powell*, —— U.S. ——, 130 S.Ct. 1195, 1203, 175 L.Ed.2d 1009 (2010) (quoting *Miranda*, 384 U.S. at 479, 86 S.Ct. 1602). The precise wording of a *Miranda* warning is flexible; "no talismanic incantation is required to satisfy Miranda." *California v. Prysock*, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981).

Defendant relies on *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), for the proposition that a valid Miranda warning must also advise that a person is free to "discontinue talking at any time." However, in holding that the Miranda warnings protect the privilege against self-incrimination by ensuring a suspect knows that he may choose to stop talking to law enforcement, the Supreme Court was not altering or amending the Miranda warnings. *Id.* That is the Court did not require the additional warning that Defendant argues is required here. Rather, the Supreme Court was observing that the four warnings prescribed by Miranda, as outlined *supra*, convey the proposition that a person has a

choice as to whether·or not to speak, that is, he may remain silent.

Furthermore, the Sixth Circuit has held that a valid Miranda warning does not require a statement that a person "has the right to stop answering questions at any point after questioning has begun." *United States v. Ellis,* 125 Fed.Appx. 691, 699 (6th Cir.2004); *United States v. Gaines,* 105 Fed.Appx. 682, 694 (6th Cir.2004), *vacated and remanded on other grounds Gaines v. United States,* 543 U.S. 1114, 125 S.Ct. 1090, 160 L.Ed.2d 1059 (2005) (finding that a defendant's oral Miranda waiver and voluntary statements to police were admissible, even if the defendant was not advised of his right to terminate questioning) (citing *United States v. Davis,* 459 F.2d 167, 168–69 (6th Cir.1972)); *United States v. Ricks,* 989 F.2d 501 (6th Cir.1993) (rejecting the argument that a *Miranda* warning must "include the right to stop answering questions at any time"); *United States v. Davis,* 459 F.2d 167, 168–69 (6th Cir.1972) (holding that a defendant need not be advised of the right to terminate questioning at any time).

As to Detective Alexander's alleged haste, Defendant does not cite any authority for the proposition that the speed with which a Miranda warning is given is relevant to its validity, nor has the Court been able to locate any authority for such a position.

■ Accordingly, Defendant's arguments that his Miranda warnings were insufficient because Detective Alexander gave them hastily and did not advise him of his right to terminate questioning are without merit. The Court has reviewed the testimony presented at hearing and concludes that Magistrate Judge Limbert's order properly held that Mr. Square knowingly, intelligently and voluntarily waived his Miranda rights. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602.

■ Moreover, the video evidence supports the Magistrate Judge's opinion. There is no indication from the video that Detective Alexander's rendition of the Miranda warning was unintelligible or incomprehensible. Nor has Defendant presented any evidence that he did not·subjectively comprehend the warnings as stated. Mr. Square acknowledged that he knew and understood his rights. Detective Alexander gave each of the now familiar warnings required by Miranda. As well, the detective directed Mr. Square's attention to a poster hanging behind him containing the very same warnings. The video depicts Mr. Square turning in his chair, his back to the detective, to view the poster as the detective gave the warnings. Further, Detective Alexander advised Mr. Square that he did not have to talk to him, that it was "his call," that he could have a "couple days to think about it," and just prior to Mr. Square's incriminating statements, he again confirmed whether Mr. Square wanted to talk to him. Detective Alexander's demeanor was not threatening or coercive, and he repeatedly reminded Mr. Square throughout the interview that he did not have to talk to him. Defendant's verbal acknowledgment and subsequent response to the Detective's questioning is adequate to demonstrate an understanding of his rights. *Berghuis v. Thompkins,* —— U.S. ——, 130 S.Ct. 2250, 2261, 176 L.Ed.2d 1098 (2010). Based on the totality of the circumstances, the Court concludes that Defendant understood his Miranda rights and, his waiver of those rights was knowing and voluntary. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

For the reasons set forth·above, the Court ACCEPTS the Magistrate Judge's Report and Recommendation and OVERRULES defendant's objection.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

GEORGE J. LIMBERT, United States Magistrate Judge.

The above-captioned case is before the Court on Defendant Clifford Square's ("Defendant") Motion to Suppress Evidence. ECF Dkt. # 21. The Honorable Sara Lioi referred the matter for a report and recommendation. ECF Dkt. # 23.

For the following reasons, the undersigned RECOMMENDS that the Court GRANT Defendant's motion insofar as it relates to a custodial interrogation conducted by Detectives Scott Moran and Thomas Klamert in the jail where Defendant was being detained, but DENY Defendant's motion in all other respects:

## I. SUMMARY

On March 24, 2010, the City of Cleveland, Division of Police Narcotics Unit executed a search warrant at 16320 Eldamere Avenue, Cleveland, Ohio. Defendant was in the driver's seat of a vehicle parked in the driveway. Evid. Hr'g. Tr. Mar. 23, 2011 (hereinafter "Tr.") at 20, 96, 113. As the SWAT team made entry into the home, detectives pulled Defendant from the car, pushed him to the ground, handcuffed him, and stood him up. *Id.* at 97, 109–10, 112. Detectives searched Defendant and found heroin and $520 in his pants. *Id.* at 104–05, 109–10, 114; Hr'g, Ex. T. A detective administered *Miranda* rights and asked Defendant if there was anything in the house that he needed to know about. *Id.* at 21–22, 99. Defendant indicated that two or three firearms were in the house. *Id.* Defendant was detained inside of the house for the remainder of the search, and he was ultimately transported to jail. *Id.* at 50, 114. A few days later, he confessed ownership of the firearms in a videotaped interview with a detective. *Id.* at 25, 58, 119.

Defendant moves for suppression of: all statements that were made by Defendant; the drugs and the money; and the firearms and ammunition themselves. *See* Tr. at 159. The search warrant authorized police to search 16320 Eldamere and any persons present there. ECF Dkt. # 21, Ex. A and Defendant does not challenge the validity of that warrant. ECF Dkt. # 25. However, Defendant contends that police were required to establish probable cause for detaining him because: (1) they improperly manipulated the timing of the execution of the search warrant; and (2) they immediately placed him under arrest upon arriving at 16320 Eldamere and they did not possess an arrest warrant. Tr. at 153–62. On November 17, 2010, the Government filed an Indictment charging Defendant with a violation of U.S.C. § 922(g)(1). ECF Dkt. # 1.

The undersigned RECOMMENDS that the Court GRANT Defendant's motion insofar as it relates to a custodial interrogation conducted by Detectives Moran and Klamert because there is no evidence that they advised Defendant of his *Miranda* rights. Further, the undersigned recommends that the Court DENY the remainder of Defendant's motion because United States Supreme Court and Sixth Circuit Court of Appeals precedent hold that officers may use handcuffs in detaining occupants of a premises suspected to contain narcotics and weapons. *Burchett v. Kiefer*, 310 F.3d 937, 943 (6th Cir.2002); *Muehler v. Mena*, 544 U.S. 93, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005); *U.S. v. Wagner*, 289 Fed.Appx. 57, 59 (6th Cir.2008), unreported; *Duncan v. Jackson*, 243 Fed. Appx. 890, 897 (6th Cir.2007). Such a detention may last for the duration of the search. *Id.* Additionally, detectives testified that Defendant acknowledged that he understood his *Miranda* rights and continued to speak with police officers afterward. Tr. at 25, 58, 98–99, 119. Lastly, detec-

tives would have inevitably discovered the firearms and ammunition located in 16320 Eldamere while executing the search warrant for that property. *See U.S. v. Keszthelyi*, 308 F.3d 557, 568 (6th Cir.2002).

## II. PROCEDURAL HISTORY

On November 17, 2010, the Government filed an Indictment charging Defendant with a violation of U.S.C. § 922(g)(1), which prohibits the possession of a firearm in or affecting commerce by any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year. ECF Dkt. # 1; 18 U.S.C. § 922(g)(1). The Indictment alleges that Petitioner, having been convicted of a felony, possessed three firearms and ammunition. *Id.* On December 16, 2010, Defendant entered a not guilty plea to the charge in the Indictment.

On February 22, 2011, Defendant filed a motion to suppress "all contraband seized by the Cleveland Police Department officers who arrested and searched [him] without reasonable suspicion, without probable cause, and without an arrest warrant, and all statements alleged to have been made by Mr. Square thereafter to law enforcement officers." ECF Dkt. # 21. On March 4, 2010, the Government filed a response brief. ECF Dkt. # 22. On March 8, 2010, Judge Lioi referred the case to the undersigned for a report and recommendation on the suppression motion. ECF Dkt. # 23.

On March 23, 2011, the undersigned conducted a hearing on the matter. The Government was represented by Assistant United States Attorney Dean M. Valore. Defendant was present, and he was represented by Assistant Federal Public Defender Jacqueline A. Johnson.

At the hearing, Defendant moved to suppress as follows:

all statements that were made by Mr. Square and to suppress the drugs and the money, although he's not been charged with that; if we proceed to trial, the government can introduce that evidence as evidence of drug trafficking.

Tr. at 159. Prior to the hearing, in chambers and with all counsel present, defense counsel made clear that she was seeking suppression of the firearms and ammunition themselves.

At the conclusion of the hearing the undersigned asked if the parties desired to submit supplemental briefs. Tr. at 162. The Government declined. *Id.* Defense counsel offered to do so if the Court would find a supplemental brief to be helpful. *Id.* The undersigned advised the parties that the existing briefs were adequate to decide the issue. *Id.*

## III. SYNOPSIS OF THE EVIDENTIARY HEARING

At the March 23, 2011, evidentiary hearing, the Government called Detective Scott Moran of the City of Cleveland Division of Police ("CPD") Narcotics Unit. Tr. at 6–71. Defendant called CPD Narcotics Unit Detective James Cudo, CPD Narcotics Unit Detective Thomas Klamert, CPD Detective Narcotics Unit Michael Alexander, CPD Narcotics Unit Detective Leland Edwards, and Alicia Square Means, Defendant's mother. *Id.* at 72–150. The following synopsis, along with the transcript of the hearing itself, is submitted to assist the Court in adjudicating the instant motion.

Detective Moran testified that he was the lead detective on an investigation into a particular male, who was suspected of selling heroin in the Lee Harvard area in the City of Cleveland. Tr. at 11, 52. Detectives Cudo, Klamert, and Edwards testified that they all participated in the investigation. *Id.* at 72–73, 85–86, 125. This investigation started in October of 2009. Tr. at 27, 85–86, 126–27. Ultimately, on

March 24, 2010, Detective Moran met with Cuyahoga County Common Pleas Judge Brendan Sheehan and obtained search warrants for four locations, 16320 Eldamere Avenue, Cleveland, Ohio ("16320 Eldamere"), being one of the locations. *Id.* at 27; *see also* ECF Dkt. # 21, Ex. A. The search warrant for 16320 Eldamere provides, in part:

> You are hereby commanded in the name of the State of Ohio, with the necessary assistance, to serve this warrant and search forthwith 16320 Eldamere Avenue, Cleveland, Ohio, its curtilage, **and any person present therein** for the property specified, . . .

ECF Dkt. # 21, Ex. A (emphasis added). Detective Moran testified that all four warrants were to be executed at approximately the same time. *Id.* at 11.

In explaining the basis for the search warrant, Detective Moran described the Narcotics Unit's investigation into one of the subject properties, 16320 Eldamere. Tr. at 6, 9–10. He explained that the unit conducted trash pulls, retrieving "dozens and dozens" of residue bags. Tr. at 12. Detective Moran testified that these bags indicated that drugs were being packaged and prepared for shipment out of 16320 Eldamere. *Id.* He also testified that the trash pulls produced documents linking Defendant to the address. *Id.* He reasoned that the documents reflected 16320 Eldamere as Defendant's mailing address. *Id.* Detective Moran further explained that he verified Defendant's information in the CPD database and determined that Defendant used "the Eldamere address." *Id.* at 14. Lastly, he testified that he used information found from the CPD database search to conduct a further search of Ohio BMV records, where the Eldamere address was again listed as Defendant's residence. *Id.*

Even though Detective Moran cited evidence linking Defendant to the Eldamere address, he later testified that the Narcotics Unit had never made a controlled drug purchase from Defendant in the course of its investigation. *Id.* at 29. Likewise, Detectives Cudo, Klamert, and Edwards all testified that they were involved in the investigation, and none of them were aware of Defendant's involvement in any controlled purchases. *Id.* at 72–76, 78, 88, 126–127. Detectives Cudo and Edwards testified that they had overseen controlled narcotics purchases in the course of the investigation in this case. *Id.*

Detective Moran described the events surrounding the search warrant execution. In the afternoon of March 24, 2010, Detective Moran served as lead detective at a briefing prior to the warrant's execution. Tr. at 49. He informed the team on Eldamere about Clifford Square and showed them a photograph. *Id.*

Detective Klamert attended the briefing, and testified that the primary target was Joron Crawford. Tr. at 90. Detective Edwards testified that he participated in the briefing session. *Id.* at 127. He testified that the detectives were primarily informed about Joron Crawford's potential presence at 16320 Eldamere, and he could not recall any other information, including the name "Clifford Square." *Id.* at 128–29. Detective Alexander, who did not assist with the investigation, was present on March 24, 2010 to assist with the execution of the search warrant on 16320 Eldamere. *Id.* at 106–07. Detective Alexander, stated that he was to handle "any people outside" as the SWAT team made entry into the residence. *Id.* at 110. He could not recall how he was made aware of his duties in this particular case, although he stated that the Narcotics Unit typically conducts briefings. *Id.* at 107. He testified that he had not seen a photograph of Defendant and he had not assisted with the investigation of this case in any way prior to March 24, 2010. *Id.* at 107, 111. Detective Cudo

did not assist with the execution of the search warrant of the Eldamere residence because his primary responsibility was to conduct surveillance on another property. *Id.* at 82–83.

Detective Moran testified that the Narcotics Unit began conducting surveillance between 4:30 P.M. and 5:00 P.M. Tr. at 15. He described the drug investigation as "large," and he explained that there were "a lot" of assisting detectives and SWAT units standing by to assist. *Id.* Different teams were assigned to each address. *Id.* According to Defective Moran, the SWAT team's role was to enter the house and secure all persons inside. *Id.* at 19. Assisting detectives were to "handle" anybody in the driveway and on the curtilage, and they were to cover any rear or side entrances if persons tried to flee. *Id.* According to Detective Moran, the intended purpose of this technique is to ensure officer safety. *Id.*

Listening to radio communications, Detective Moran heard the surveillance team on Eldamere discussing a blue Dodge Charger that would come to the Eldamere address, leave for a short period of time, and return. Tr. at 16. Detective Moran could recall that the Charger made more than one but less than ten trips to and from the Eldamere residence on March 24, 2010. *Id.* at 17.

As the surveillance team was observing the Charger, the Narcotics Unit was observing its primary target, Joron Crawford. *Id.* at 16–17, 31. After losing sight of Mr. Crawford, the Narcotics Unit made the decision to execute all four search warrants. *Id.* at 17–18. Detective Moran clarified that the decision to execute the warrants was a joint decision between himself and his superior officer, Lieutenant Mike Connelly. *Id.* at 29–31.

Detective Moran testified that the Narcotics Unit was "staged away" from 16320 Eldamere, and as they were making their way to residence, the Dodge Charger pulled into the driveway. Tr. at 18; *see also Id.* at 43, 45 (Det. Moran: "He [Defendant] had left the house and we decided to execute the search warrant. As the convoy of SWAT was pulling up, it was just misfortune for Mr. Square that he happened to pull in two minutes before we were executing the warrant ... The car arrived as we were coming-driving there. We were mile, mile and a half away from Eldamere. As the convoy's rolling, Square actually pulls into the drive."). Detective Moran explained that he drove the lead car, and his responsibility was to point the SWAT team to 16320 Eldamere. *Id.* at 20; 44. The SWAT team then proceeded up the driveway. *Id.*

As the SWAT team approached the house, Detective Moran approached the Dodge Charger with Detectives Klamert and Alexander. Tr. at 20, 96, 113. Detective Moran observed Detectives Klamert and Alexander remove Defendant from the driver's seat. *Id.* Detective Moran testified that he then proceeded to the house to provide cover at the rear until it was secured. *Id.* at 20, 45.

Detective Alexander explained his interaction with Defendant during this time: "When we initially approached his vehicle, I had no idea who was inside this vehicle. He [Defendant] was initially being detained irregardless [sic] of who that person was, whether it was Mr. Square or anyone else." Tr. at 123. Detective Alexander testified that by the time Defendant observed the police, Detective Alexander was at the driver's side door of the Dodge Charger. *Id.* at 113. Detective Klamert was accompanying Detective Alexander. *Id.* at 109–10. Detectives Alexander and Klamert told Defendant to put his hands in the air, and he complied. *Id.* Detective Alexander testified that they opened the car door, pulled Defendant out, and handcuffed him. *Id.* Detective Alexander was

"pretty sure" that he was the one who placed handcuffs on Defendant. *Id.* at 112.

Also recounting Defendant's initial detention, Detective Klamert testified that he approached the Eldamere residence in a takedown car, which he described as "more of a police car." Tr. at 96. He saw Defendant in the driver's seat of the car in the driveway. *Id.* Detective Klamert testified that he ordered Defendant out of the car. *Id.* Detective Klamert recalled that a group of detectives pulled Defendant out of his car, put him on the ground, and handcuffed him immediately. *Id.* at 97. He testified that Defendant made no statements before he was handcuffed. *Id.* at 97–98.

According to Detective Alexander, once the SWAT team made entry into the house, detectives stood Defendant up off the ground, and Detective Alexander patted him down for weapons. Tr. at 114. At that point, Detective Alexander found heroin in Defendant's pants. *Id.* at 109–10, 114. Detective Klamert testified that he was present when Detective Alexander found heroin in Defendant's pants. *Id.* at 104–05. Further, Detective Klamert was responsible for making an inventory of evidence seized. *Id.* at 93. The evidence log that he created reflects that Detectives Alexander and Klamert retrieved heroin from Defendant's pants. Hr'g, Ex. T.; *see also* Tr. at 108 (as to Detective Alexander's badge number), Ex. T (as to Detective Klamert's badge number).

Detective Alexander testified that Detective Moran then intervened and inter-

viewed Defendant. Tr. at 114, 116. Detective Alexander then began assisting with the other occupant of the vehicle, Gregory Payne. *Id.* at 115, 116. Due to his distance from Defendant at that point in time, Detective Alexander contends that he did not have any discussions with Defendant or hear him answering any questions. *Id.* at 114–17.

Detective Moran explained that, once the house was secured, he returned to speak to Defendant. Tr. at 21, 46. At that point, Detectives Klamert and Alexander had already discovered heroin on Defendant's person. *Id.* at 21, 46, 100. Detective Moran testified that he *Mirandized* Defendant. *Id.* at 21. He testified that Defendant acknowledged that he understood his *Miranda* rights. *Id.* Defendant did not execute a *Miranda* form. *Id.* at 46. Detective Klamert testified that: he was also present; he heard Detective Moran read Defendant his *Miranda* rights, he heard Defendant state that he understood those rights, and Defendant did not sign a form acknowledging that he understood his rights. *Id.* at 98–99.

Detective Moran testified that he asked Defendant if there was anything in the house that he needed to know about, including drugs or firearms. Tr. at 21–22; *see* also Tr. at 99 (Det. Klamert). Defendant stated that there were two or three guns in the house. *Id.* After questioning Defendant and ensuring that the SWAT team had finished sweeping the residence, Detective Moran escorted Defendant into the house. Tr. at 50 (Det. Moran), 99 (Det. Klamert),[1] 114 (Det. Alexander). Ul-

---

1. Detective Klamert testified that Detective Moran took Defendant into the house. Tr. at 98, 100. It is not entirely clear from Detective Klamert's testimony whether this occurred before or after Detective Moran *Mirandized* and questioned defendant. Detective Klamert did not testify when Detective Moran took Defendant into the house in relation to these activities. However, Detective Klamert did state that SWAT was inside looking while Detective Moran was questioning Defendant, and he did not know if they were given a clear signal from the SWAT team before Defendant made any statements. *Id.* at 99. Given this testimony, the undersigned concludes that Detective Klamert's testimony supports a

timately, police found three firearms in the southwest bedroom of the home. *Id.* at 22–24.

Alicia Square Means testified that she was in an upstairs bedroom of the residence located at 16320 Eldamere when the SWAT team entered on March 24, 2010. Tr. at 140, 143–144. She testified that she was handcuffed, and placed on her knees on the living room floor. *Id.* at 143–44. She testified that she heard Defendant telling the police not to take her to jail. *Id.* at 146. She explained:

> the reason I didn't want to go to jail is because in 30 minutes we were supposed to leave because my father had passed away on Sunday, and I was basically begging them to just understand that I was going to the funeral and we all were going.
>
> But I knew that they had told me—the gentleman when he came in and brought Clifford in, him and Clifford was talking, the officer, he was telling Clifford that he was going to jail; and Clifford was begging and pleading not to take me. And then he told the officer he said that okay then don't take my mom, I'll just say everything's mine and nobody else said nothing. They ask me no questions. Then when he came downstairs, they told Clifford that I was going to jail, and then at that point everybody stopped talking.

*Id.* at 146–47. Ms. Square Means, then explained that she told police about the funeral once she was placed in a police car. *Id.* at 148–49.

Detective Moran and Detective Klamert did not recall Defendant saying anything about a funeral during his detention in the residence. Tr. at 55 (Det. Moran), 103 (Det. Klamert).

Defendant was transported to jail. Tr. at 56. Detective Moran met with him in the jail where he was being held. *Id.* Detective Moran was accompanied by Detective Klamert. *Id.* at 57. Detective Moran testified that he informed Defendant that the police would be willing to work with him if he was willing to cooperate in the Joron Crawford investigation. *Id.* Detective Moran stated that Defendant was not interested in cooperating with police at that point in time. *Id.* at 58.

Detective Alexander testified that he later met with Defendant at the jail where he was being detained. Tr. at 118. He testified that he advised Defendant of his "rights." *Id.* at 119. He also testified that Defendant acknowledged that he was aware of his rights, but he did not sign an acknowledgment or waiver. *Id.* at 119. Detective Alexander testified that he asked Defendant about cooperating with investigations into other illegal activity being conducted in the City of Cleveland. *Id.* at 120. Detective Alexander did not testify as to whether Defendant made a confession during this meeting, but Detective Moran stated that Defendant confessed ownership of the firearms to Detective Alexander during a videotaped interview. *Id.* at 25, 58, 119 (Det. Alexander's interview was videotaped).

## IV. PROPOSED FINDINGS OF FACT

Pursuant to Federal Rule of Criminal Procedure 59(b)(1) and for the Court's consideration, the undersigned offers the following proposed findings of fact, along with any other proposed findings of facts contained elsewhere in this Report and Recommendation:

Based upon observation of all of the testimony at the evidentiary hearing, the

---

finding that Detective Moran *Mirandized* and questioned Defendant before taking him in-

side the house.

undersigned finds the testimony of CPD Detectives Moran, Cudo, Klamert, Alexander, and Edwards to be generally credible. The undersigned bases this conclusion on general observations of the detectives' demeanor, mannerisms, content, and consistency of their testimony. For reasons discussed below, the undersigned finds it unnecessary to assess the veracity of Alicia Square Means' testimony.

The undersigned recommends that the Court adopt the following sequence of events as fact for the purpose of this motion:

1. In October of 2009, the CPD Narcotics Unit undertook an investigation into Joron Crawford, and the investigation was lead by Detective Moran ("Crawford investigation"). (Tr. at 11, 27, 52, 85–86, 126–27).

2. While investigating one of the subject properties, 16320 Eldamere Avenue, Cleveland, Ohio, the unit conducted trash pulls, retrieving "dozens and dozens" of narcotics residue bags, along with documents indicating the Defendant used 16320 Eldamere as his mailing address. Tr. at 12.

3. Detective Moran verified that Ohio BMV records also listed 16320 Eldamere as Defendant's address. Tr. at 12.

4. The Narcotics Unit made no controlled purchases or controlled purchase attempts from Defendant during its investigation. Tr. at 29, 72–76, 78, 88, 126–27.

5. At approximately 1:00 P.M. on March 24, 2010, Detective Moran obtained search warrants for four locations thought to be involved in the Crawford investigation. Tr. at 27, 29.

6. One of the warrants permitted the search of 16320 Eldamere, its curtilage, and any person therein. Tr. at 18, ECF Dkt. # 21, Ex A.

7. On the afternoon of March 24, 2010, Detective Moran served as lead detective at a briefing. Tr. at 49. He informed the team on Eldamere about Defendant and showed them a photograph of Defendant. *Id.*

8. The Narcotics Unit began surveillance between 4:30 P.M. and 5:00 P.M. Tr. at 15.

9. SWAT units were standing by to assist with entering the house and securing all persons inside. Tr. at 15, 19. The SWAT unit assigned to 16320 Eldamere was "staged away" from the residence. *Id.* at 18.

10. As the Narcotics Unit conducted its surveillance and the SWAT units stood by, a surveillance team observed a blue Dodge Charger enter and leave 16320 Eldamere between one and ten times. Tr. at 16–17.

11. At the same time, the Narcotics Unit was also conducting surveillance on Joron Crawford. Tr. at 16–17, 31.

12. After losing sight of Mr. Crawford, the Narcotics Unit made the decision to execute all four search warrants. Tr. at 17–18.

13. As the Eldamere team approached 16320, Defendant entered the driveway. Tr. at 18, 43, 45.

 a. The undersigned recommends that the Court find that the timing of the search warrant execution was not calculated to detain Defendant in the driveway. The undersigned bases this recommendation on Detective Moran's testimony that the convoy began "rolling" from a mile or a mile and a half away before Defendant entered the driveway. Tr. at 43, 45. Additionally, it is questionable that police intended to time the execution of the warrant in order to detain Defendant because Detective Alexander, who ultimately

handcuffed Defendant, testified that he would have detained any occupants of the vehicle, and he had not seen a photograph of Defendant prior to the warrant execution. Tr. at 107, 111, 112, 123.

14. Simultaneously, the SWAT team approached the house, and Detectives Moran, Klamert, and Alexander approached the Dodge Charger. Tr. at 20, 96, 113.

15. Detective Moran observed as they Detectives Klamert and Alexander removed Defendant from the Charger. Tr. at 20. Detective Moran then proceeded to the house and provided cover there until it was secure. *Id.* at 20, 45.

16. Detectives Alexander and Klamert ordered Defendant to put his hands in the air, and he complied. Tr. at 109–10. They then pulled Defendant out of the car, put him on the ground, and Detective Alexander immediately handcuffed him. Tr. at 97, 109–10, 112.

17. Detectives Alexander and Klamert stood Defendant up after the SWAT team had entered the residence. Tr. at 114. Detective Alexander patted defendant down for weapons and discovered heroin in his pants. Tr. at 104–05, 109–10, 114; Hr'g, Ex. T.

18. Detective Alexander returned to the area where Defendant was detained. Tr. at 21, 46, 100, 114, 116.

19. Detective Alexander verbally administered *Miranda* rights to Defendant. Tr. at 21, 98. Defendant verbally acknowledged that he understood his *Miranda* rights. *Id.*

20. Detective Alexander asked Defendant if there was anything in the house he [Detective Moran] needed to know about, are there any more drugs, any guns? Tr. at 21–22, 99. Defendant stated that there were two to three guns in the house. *Id.*

21. Detective Moran escorted Defendant into the house. Tr. at 50, 99,[2] 114.

22. Ultimately, police found three firearms in the southwest bedroom of the home. Tr. at 22–24; Hr'g, Ex. T. Police also found a box of ammunition in the basement.

23. Following Defendant's arrest, he was transported to jail. *See* Tr. at 56.

24. Detectives Moran and Klamert met with him in the jail where he was being held. Tr. at 56, 57. It is unclear whether the detectives read Defendant *Miranda* rights at this time.

25. Detective Alexander testified that he later met with Defendant at the jail where he was being detained. Tr. at 118. He testified that he advised Defendant of his "rights." *Id.* at 119. He also testified that Defendant acknowledged that he was aware of his rights, but he did not sign an acknowledgment or waiver. *Id.* at 119. Defendant confessed ownership of the firearms to Detective Alexander during a videotaped interview. *Id.* at 25, 58, 119.

 a. Considering the context of Detective Alexander's testimony, the undersigned concludes that Detective Alexander's reference to "rights" was a reference to *Miranda* rights. Additionally, defense counsel had raised the issue of *Miranda* rights earlier in Detective Alexander's direct examination.

In this chain of events, it is undisputed that police seized $520 from Defendant. It is unclear exactly when that seizure occurred. It is clear that the seizure oc-

**2.** *See supra* note 1.

curred some time after Detective Alexander seized the heroin from Defendant's pants. This conclusion is well-supported by the record. First, Detective Alexander testified that he patted Defendant down and found heroin. Tr. at 114. At that point, he left to assist other Detectives with Mr. Payne. *Id.* Detective Alexander unequivocally testified that he did not participate in the discovery of the $520 on Defendant's person. *Id.* at 108–09. Detective Moran testified that $520 was found in Defendant's pockets. *Id.* at 66. However, he did not state who made the discovery or when. *Id.* The search inventory indicates that Detectives Klamert, Moran, and a third officer (badge number 1396) participated in the discovery. *See* Hr'g, Ex. T,; *see also Id.* (as to Det. Klamert's badge number); Tr. at 60 (as to Det. Moran's badge number). Again, what is clear, and what the undersigned recommends that the Court adopt as a finding of fact, is a determination that the $520 was seized *after* Detective Alexander seized heroin from Defendant's pants.

## V. ANALYSIS

### A. FOURTH AMENDMENT ANALYTICAL FRAMEWORK

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment applies to state actors through the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 654–55, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The remedy for a violation of the Fourth Amendment is exclusion of the improperly secured evidence and all evidence obtained as a result of the violation. *Id.; Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

"It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Feldman,* 606 F.2d 673, n. 11 (6th Cir.1979). "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334, (1993). Therefore, a defendant's showing that a warrantless search has occurred generally constitutes a prima facie showing of illegality, and the Government has the burden of showing that an exception applies. *United States v. Herndon,* 501 F.3d 683, 692 (6th Cir.2007). The Government must show by a preponderance of the evidence that the search and seizure was reasonable. *United States v. Matlock,* 415 U.S. 164, n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

### B. APPLICATION

The case at bar presents several issues: (1) whether Defendant has established standing to challenge the seizure of evidence from 16320 Eldamere; (2) whether police improperly manipulated the timing of the execution of the search warrant in order to detain Defendant; and (3) whether police used reasonable force in detaining Defendant; (4) whether police were required to demonstrate an independent basis of probable cause for detaining Defendant; (5) whether any *Miranda* violations occurred; (6) whether evidence

seized from Defendant's person is admissible; and (7) whether any derivative evidence must be excluded.

### i. Standing

Defendant argues that the Government has not proven that he lived at 16320 Eldamere. Tr. at 155 ("they haven't actually proved that he lives in that house."). Defendant further questions whether there has been any evidence showing that the firearms and ammunition were seized from a bedroom that belongs to him. Tr. at 156 ("There wasn't any testimony that that bedroom where they found the weapons actually belongs to my client. They said that he confessed and said there were guns in the house, and then they said that that was his bedroom. They don't even put him in that house on that day."); *see also* Tr. at 158 ("There was testimony from one of the witnesses that it was evident that someone slept in that basement. I didn't hear anyone say that that was Clifford Square's bed or that that ammunition was his, just his statement that if you find guns, whatever you find, I'll be responsible."). Defense counsel even pointed out during questioning that Detective Cudo had never seen Clifford Square at 16320 Eldamere during his surveillance of that address. Tr. at 83. Similarly, she asked if Detective Klamert had seen Joron Crawford with Clifford Square during the period in which Detective Klamert was performing "spot checks" of 16320 Eldamere. *Id.* at 91–92. She questioned Detective Edwards' basis of knowledge when he stated that he believed that Clifford Square resided in 16320 Eldamere. *Id.* at 133.

These arguments may even bear the greatest weight on the ultimate outcome of this case, should it proceed to trial. However, the undersigned is presently concerned only with Fourth and Fourteenth Amendment considerations involving the seizure of evidence. With this consideration in mind, Defendant has the burden of establishing standing to challenge the search and seizure pertaining to the firearms and ammunition.[3] *Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois,* 439 U.S. at 133–34, 99 S.Ct. 421. (quotations omitted). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* "[T]he Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Id.* at 143, 99 S.Ct. 421. It is Defendant's burden to establish such a legitimate expectation of privacy. *Id.* at 148, 99 S.Ct. 421.

The Sixth Circuit has held that a defendant must satisfy a two-part test to establish standing: (1) whether he manifested a subjective expectation of privacy in the object of the challenged search; and (2) whether society is prepared to recognize that expectation as legitimate. *U.S. v.*

---

**3.** Defendant unquestionably has standing to challenge any searches and seizures pertaining to his person. *See Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("We have recently held that the Fourth Amendment protects people, not places, wherever an individual may harbor a reasonable expectation of privacy, he is entitled to be free from unreasonable governmental intrusion ... Unquestionably petitioner was entitled to the protection of the Fourth Amendment as he walked down the street in Cleveland.") (citations omitted).

*Sangineto–Miranda,* 859 F.2d 1501, 1510 (6th Cir.1988).

The undersigned is of the opinion that adequate evidence exists to establish Defendant's residence at 16320 Eldamere. Detective Moran retrieved mail indicating that 16320 Eldamere was Defendant's mailing address, and Ohio BMV records also indicated that it was his mailing address. Nevertheless, the undersigned acknowledges that firearms and ammunition were found in a locked bedroom and in the ceiling above a sleeping area in the basement. Hr'g Ex. T, Tr. at 23–24, 61. Defendant contested the Government's assertion that he had control over these areas, and that he was even a resident of 16320 Eldamere. *See, e.g.,* Tr. at 155, 156, 158, *discussed supra.* Defendant challenges his connection to the residence and his admissions regarding ownership of the firearms in order to demonstrate that police lacked probable cause to arrest him. *Id.* at 158–59. In so doing, Defendant also necessarily undermines his standing to challenge the seizure of those firearms. The two analyses (lack of probable cause and standing) are conceptually linked in this case since a defendant's alleged possession of contraband is insufficient to establish standing. *U.S. v. Salvucci,* 448 U.S. 83, 85, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

Given the record of this case, the Government may not be able to establish that Defendant possessed the firearms and ammunition without also establishing facts that would demonstrate his residence at 16320 Eldamere. Nevertheless, the undersigned will not speculate as to the evidence to be introduced at trial.

Accordingly, the undersigned views this issue as a matter of Defendant's failure to carry his burden of establishing a legitimate expectation of privacy in the particular areas searched. To the extent that Defendant could mount a successful challenge regarding his connection to the searched areas, he would simultaneously disprove standing to challenge those searches. Simply put, Defendant cannot deny residence at 16320 Eldamere, deny a connection to the southwest bedroom, deny a connection to the basement, and still seek protection from the Fourth Amendment.

Additionally, there was no evidence of record specifically indicating that Defendant has a privacy interest in the particular areas where the contraband was discovered. In *U.S. v. Smith,* 783 F.2d 648, 649–50 (6th Cir.1986), the Sixth Circuit held that a defendant ("Smith") has no standing to object to contraband seized from a third party's basement in Smith's presence. The *Smith* court reasoned that:

> The burden of production and persuasion rests on the person seeking to suppress evidence. *United States v. Arboleda,* 633 F.2d 985, 989 (2d Cir.1980). Smith could have testified at the suppression hearing in support of his claim, but did not do so. Any testimony by Smith at that hearing could not have been admitted as evidence of guilt at the trial. *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968). The fact that Smith was in possession of marijuana at the time of the search did not establish a legitimate expectation of privacy in the area searched. *United States v. Salvucci,* 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980). His presence is totally unexplained and the record discloses no facts which entitle him to object to the search.

*Smith,* 783 F.2d at 650. Likewise, Defendant offered no evidence connecting himself to 16320 Eldamere; he disputed any connection to that property or to the areas where contraband was found. If the Court finds Defendant's probable cause argu-

ments to be persuasive, the undersigned recommends that the Court determine Defendant has failed to meet his burden of production or persuasion with respect to standing to challenge the seizure of any items contained within 16320 Eldamere.

▮ The undersigned finds that the testimony related to Ms. Square Means' father's funeral bears very little significance in determining the propriety of the searches and seizures under the Fourth and Fourteenth Amendments. Detective Moran testified that Defendant asked police not to take his mother to jail, and he said that "she doesn't have anything to do with this." Tr. at 55. (Det. Moran's language). Defense counsel asked Detectives Moran and Klamert if they recalled Defendant asking them not to take his mother to jail because she had to attend her father's funeral. Id. at 55, 103. Defense counsel's questions may be construed as an attempt to undercut any implication of a confession which may be gleaned from Detective Moran's testimony.

Even if these questions were successful in disproving Defendant's ownership of the contraband seized in the home, Defendant has failed to establish standing in the areas in which the contraband was retrieved. As an evidentiary matter, the undersigned notes that neither Detective Moran nor Detective Klamert recalled Defendant making a statement about the funeral, and Ms. Square Means' testimony did not recount any statement by Defendant regarding the funeral. Id. at 55, 103, 146–47. Accordingly, the undersigned recommends that the Court find insufficient support for this argument in the record.

In sum, the undersigned believes the record supports a finding that Defendant resided at 16320 Eldamere. To the extent that the Court finds merit in Defendant's arguments related to the Government's failure to establish proof of his residence there or his connection to any particular area of the house, the undersigned RECOMMENDS that the COURT find that Defendant lacks standing to challenge the search of the dwelling and the resulting seizure of any evidence discovered therein, including: a Titan Tiger .38 caliber revolver and six live rounds (Serial number NO14726); Interarm .357 Mag. revolver with six live rounds (Serial number scratched off); RG .22 caliber revolver model # RG23 with four live rounds (Serial Number 255860); and box of .38 caliber ammunition. Hr'g. Ex. T# 14, 15, 16, 20.

### ii. Alleged Manipulation of Search Warrant Execution Timing

Defendant contends that police improperly manipulated the timing of the execution of the search warrant in order to detain him. Tr. at 157. Defendant relies on *U.S. v. Cochran*, 939 F.2d 337 (6th Cir.1991), for support. ECF Dkt. # 21 at 12. Defendant contends that the Sixth Circuit noted in *Cochran* that the facts and evidence did not suggest that the officers attempted to manipulate the circumstances in order to search the *Cochran* defendant ("Cochran") or his car. *Id.* Therefore, Defendant contends that if police in this case manipulated the timing of the execution of the search warrant in order to detain him, such manipulation would exceed the bounds of *Cochran*. *Id.*

At the evidentiary hearing, Defendant contended that police obtained the nighttime search warrant for 16320 Eldamere by 5:00 P.M. and it was dark sometime around 7:00 P.M. Tr. at 157. Defendant further argued that there was no apparent reason to delay the execution until approximately 10:45 P.M., and the effect of doing so permitted police to search Defendant's person under the warrant when they otherwise lacked probable cause to do so. Tr. at 157, 158.

Defendant's reliance on *Cochran* is misplaced. Most importantly, *Cochran* in-

volved three separate events bearing Fourth Amendment significance: an initial detention of Mr. Cochran, whose premises were subject to a search warrant; a search of the glove compartment of the vehicle he was driving; and a search of the trunk of the vehicle he was driving. *Cochran,* 939 F.2d at 338. The Sixth Circuit upheld Cochran's detention based on the United States Supreme Court's decision in *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). *Cochran,* 939 F.2d at 338–39 ("... the [*Summers*] Court concluded that 'a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.'") quoting *Summers,* 452 U.S. 692, 101 S.Ct. 2587 (1981). It was only in discussing the search of Cochran's vehicle that the *Cochran* court noted that police did not improperly manipulate the timing of the execution of the search warrant. *Cochran,* 939 F.2d at 338–40. The *Cochran* court summarized its holding as follows:

> ... the facts and evidence do not suggest that the police attempted to manipulate the circumstances in order to search [Cochran's] car. Indeed, it was [Cochran's] acts, not those of the police, that led to the search of the automobile.
>
> * * * *
>
> In conclusion, the initial stop of defendant for the purpose of detention while searching his home was valid. The purpose and scope of the initial stop was broadened because of [Cochran's], not the officers', acts. Hence, we disagree with [Cochran] that the officers attempted to manipulate the circumstances so as to expand the scope of their search warrant.

*Id.* at 340. The *Cochran* court relied wholly on *Summers* in determining the propriety of the Cochran's initial detention. The court did not discuss or analyze search

warrant timing manipulation in connection with Cochran's initial seizure. Therefore, the undersigned recommends that the Court reject Defendant's interpretation that "the Sixth Circuit specifically noted the facts and evidence in Cochran did not suggest officers attempted to manipulate the circumstances in order to search **the defendant** or his car." ECF Dkt. # 21 at 12 (emphasis added). Further, the Cochran court did not endeavor to establish any "bounds" regarding search warrant timing manipulation, as Defendant contends. Accordingly, Defendant cannot find support in Cochran for the proposition that police improperly manipulated the timing of the search warrant in this case for the purpose of detaining him.

 In fact, on a direct application of the holding in *Cochran,* Defendant's detention was appropriate in this case. The *Cochran* court held that it was appropriate to detain Mr. Cochran because "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Cochran,* 939 F.2d at 339 quoting *Summers,* 452 U.S. at 705, 101 S.Ct. at 2595 (footnotes omitted). In the same way that Mr. Cochran's detention was proper pursuant to the execution of a search warrant on his premises, so was Defendant's detention during the execution of the search warrant in this case.

In addition to misplacing reliance on *Cochran,* Defendant has provided no precedent affirmatively stating that the Fourth Amendment prevents police from intentionally timing the execution of a search warrant for strategic purposes. Although the undersigned has not located any Sixth Circuit opinions directly confronting this issue, other Circuits have upheld evidentiary seizures, explicitly noting instances where police have intentionally manipulat-

ed the timing of a search warrant's execution. *See U.S. v. Abumayyaleh,* 530 F.3d 641, 649 (8th Cir.2008) (During controlled-buy operation, where an undercover officer sold a firearm to a felon, the Eight Circuit held that, "[w]hether officers suspected Abumayyaleh had other weapons and whether they waited to execute the warrant until he bought a firearm from the informant does not affect the reasonableness and constitutionality of the search warrant."); *U.S. v. Dunnings,* 425 F.2d 836 (2d Cir.1969) (Considering whether the term 'forthwith' requires immediate execution of a search warrant, the Second Circuit held: "Even if we were to think that the sole reason for the delay was to effectuate Dunnings' arrest, it would not follow that the search was invalid."). Recognizing that *Abumayyaleh* and *Dunnings* are not binding on this Court, the undersigned emphasizes the lack of any Sixth Circuit precedent forbidding the conduct in the case at bar.

■ Additionally, the testimony in this case indicates that the CPD did not intentionally manipulate the timing of the execution of the search warrant in order to detain Defendant. Detective Moran testified that CPD obtained four search warrants for four locations related to one heroin trafficking investigation. Tr. at 11. He testified that all of the warrants were to be executed at the same time. *Id.* at 69. The Dodge Charger arrived as the police caravan was coming. *Id.* at 45. He testified that "We were mile, mile and a half from Eldamere. As the convoy's rolling, Square actually pulls into the drive. So he's there for—I mean, not a long time. He's there for a few minutes until we actually arrived at the house." *Id.* Detective Moran also indicated that he did not know who the occupants of the Dodge Charger were when they began the warrant execution. *Id.* at 20.

Detective Alexander, who detained Defendant, stated that he was to handle "any people outside" as the SWAT team made entry into the residence. Tr. at 110. He testified that he had not seen a photograph of Defendant and he had not assisted with the investigation of this case in any way prior to March 24, 2010. Tr. at 107, 111. Further, he testified that he would have detained the occupants of the vehicle, regardless of who they were. *Id.* at 123.

Since the evidence of record shows that the order to execute four warrants occurred simultaneously as a part of a "large" investigation, the Dodge Charger entered the driveway of 16320 Eldamere only after the police convoy began "rolling" from a mile to a mile and a half away, and the detective who detained Defendant had no prior knowledge of him, the undersigned recommends that the Court find, as a factual matter, that the police in this case did not manipulate the timing of the execution of the search warrant in order to detain Defendant.

### iii. Detention

Defendant contends that, but for the fact that the police had a search warrant, they lacked probable cause to arrest him. Tr. at 157–158. Defendant may very well be correct that police otherwise lacked probable cause to search or arrest him on March 24, 2010. However, it is unnecessary to speculate regarding that scenario, because police did have a search warrant. ECF Dkt. # 21, Ex. A. The warrant authorized police to search "16320 Eldamere Avenue, Cleveland, Ohio, its curtilage, **and any person present therein** for the property specified [Heroin and other narcotic drugs and/or controlled substances ... money, firearms, and other weapons being illegally possessed ... ]" *Id.* (emphasis added). Defendant does not challenge the validity of the search warrant. ECF Dkt. # 25; Tr. at 160. Instead, Defendant con-

tends that it is clear that he was arrested right away because he was pulled out of the car, thrown to the ground, handcuffed, and taken into the house. *Id.* at 160–61.

 Defendant's argument is not persuasive. Foremost, the warrant authorized a search for firearms, among other things. ECF Dkt. # 21, Ex. A. Accordingly, police were permitted to exercise a requisite and proportionate level of urgency and force. *See U.S. v. Johnson*, 215 F.3d 1328 (table), 2000 WL 712385 at *1, *5 (6th Cir. May 24 2000), unreported; *Kelley v. McCafferty*, 283 Fed.Appx. 359, 363–64 (6th Cir.2008) unreported (In a case concerning the execution of a search warrant for narcotics, the Sixth Circuit held that a reasonable juror could not determine that the act of a police officer pointing a firearm at the occupant of a search premises, in and of itself, constitutes an unreasonable search and seizure.). While Defendant takes issue with the fact that police pulled him out of the Charger, the undersigned notes that police did find a firearm in that vehicle. Tr. at 24.

 "Law enforcement officials have a limited authority to detain occupants of a premises while a proper search is being conducted." *U.S. v. Bohannon*, 225 F.3d 615, 617 (6th Cir.2000) citing *Summers*, 452 U.S. at 705. The Sixth Circuit has held that police officers' powers under *Summers* also permit detention of nonresidents who are present at the scene of the search when police arrive. *Burchett*, 310 F.3d at 943. Clear precedent establishes that police may immediately handcuff occupants of a residence while executing a search warrant for weapons. *See, e.g., Muehler*, 544 U.S. 93, 125 S.Ct. 1465; *Wagner*, 289 Fed.Appx. at 59; *Duncan*, 243 Fed.Appx. 890 ("Given that the search was for a fugitive bank robbery suspect believed to be armed and dangerous and that a number of individuals were present at the time of the search, the

governmental interests in the safety of the officers and others, preventing flight, and facilitating the orderly completion of the search justified the detention of the occupants and handcuffing of the two white males until the identities of everyone were established and the sweep of the premises was completed."). The United States Supreme Court considered these facts in *Muehler*, when police executed a search warrant to look for deadly weapons and evidence of gang membership:

> At 7 a.m. on February 3, 1998, petitioners, along with the SWAT team and other officers, executed the [search] warrant. Mena was asleep in her bed when the SWAT team, clad in helmets and black vests adorned with badges and the word "POLICE," entered her bedroom and placed her in handcuffs at gunpoint. The SWAT team also handcuffed three other individuals found on the property. The SWAT team then took those individuals and Mena into a converted garage, which contained several beds and some other bedroom furniture. While the search proceeded, one or two officers guarded the four detainees, who were allowed to move around the garage but remained in handcuffs.

*Muehler*, 544 U.S. at 96, 125 S.Ct. 1465. In an ensuing suit against the officers pursuant to 42 U.S.C. § 1983, the *Muehler* Court reaffirmed the holding in *Summers* that "officers executing a search warrant for contraband have the authority 'to detain the occupants of the premises while a proper search is conducted.'" *Id.* at 98, 125 S.Ct. 1465 quoting *Summers*, 452 U.S. at 705, 101 S.Ct. 2587. "Such detentions are appropriate, we explained, because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." *Id.* The *Muehler* Court further explained the rationale supporting the holding in *Summers:*

we posited three legitimate law enforcement interests that provide substantial justification for detaining an occupant: "preventing flight in the event that incriminating evidence is found"; "minimizing the risk of harm to the officers"; and facilitating "the orderly completion of the search," as detainees' "self-interest may induce them to open locked doors or locked containers to avoid the use of force." *Muehler*, 544 U.S. at 98, 125 S.Ct. 1465 quoting *Summers*, 452 U.S. at 702–03, 101 S.Ct. 2587. The *Muehler* Court concluded that "Mena's detention was, under Summers, plainly permissible." *Id.* (footnote omitted). This is because "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Id.* quoting *Summers*, 452 U.S. at 705, n. 19, 101 S.Ct. 2587. In stating the foregoing rule of law, the Summers court reasoned, in part, that "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Summers*, 452 U.S. at 702, 101 S.Ct. 2587. Notably, in *Summers*, there was no evidence of record to suggest that a special danger presented to police. *Id.*

■ "Inherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Muehler*, 544 U.S. at 98–99, 125 S.Ct. 1465 (citation omitted). The *Muehler* Court specifically held that the officer's use of force in the form of handcuffs to effectuate Mena's detention in the garage was reasonable. *Id.* at 99, 125 S.Ct. 1465. The Court stated that "this was no ordinary search" because the warrant authorized a search for weapons and a wanted gang member resided at the premises. *Id.* at 100, 125 S.Ct. 1465. Additionally, the

Court noted that the presence of multiple occupants made the use of handcuffs "all the more reasonable." *Id.*

In *Wagner*, the Sixth Circuit found no Fourth Amendment violation when police handcuffed a defendant for the duration of a search for narcotics. *Wagner*, 289 Fed. Appx. at 58–59. ATF agents obtained a search warrant for drug trafficking items in Wagner's apartment. *Id.* at 58–59. As officers were approaching the apartment building, they encountered Wagner, handcuffed him, escorted him back to the apartment, and detained him for the duration of the search. *Id.* at 59. The Sixth Circuit held: "We agree with the district court that the actions of the officers constituted a detention, not an arrest, and we see no violation of the Fourth Amendment arising out of these events." *Id.*

■ In this case, the search warrant authorized police to search for heroin and other narcotics, as well as firearms and other weapons. ECF Dkt. # 21, Ex. A. This warrant authorized the type of search that permitted officers to detain persons found at 16320 Eldamere without regard to any quantum of proof justifying their detention. *See Summers*, 452 U.S. at 705, n. 19, 101 S.Ct. 2587. Therefore, the undersigned sees no merit in Defendant's argument that police lacked probable cause or a reasonable suspicion to believe that he was engaged in criminal activity on March 24, 2010. Additionally, police were authorized to use handcuffs in detaining the occupants of 16320 Eldamere because the premises contained numerous occupants and the warrant authorized a search for firearms, weapons, and narcotics. *See Muehler*, 544 U.S. at 100, 125 S.Ct. 1465, *Summers*, 452 U.S. at 702, 101 S.Ct. 2587; *Wagner*, 289 Fed.Appx. at 59; *Duncan*, 243 Fed.Appx. at 896–97.

The undersigned notes that the *Summers* Court required courts to afford def-

erence to the decisions police officers make in detaining occupants of premises to be searched: "The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Summers,* 452 U.S. at 702–03, 101 S.Ct. 2587 quoting 2 W. LaFave, Search and Seizure § 4.9, pp. 150–151 (1978). Therefore, the Court should give deference to the procedures employed in this case when the officers removed Defendant from the Charger, placed him on the ground, kept him there until the SWAT team indicated that it had finished sweeping the house, and then stood him up and searched him.

■ As a final note, Defendant contends that police placed him under arrest right away. The undersigned disagrees. Under the totality of the circumstances, the intrusion that Defendant experienced was minor compared to the police officers' safety and the safety of the other people present at 16320 Eldamere. The testimony demonstrates that police detained Defendant quickly and they quickly performed a search of his person pursuant to the warrant.

Applying the law to the circumstances of this case, the undersigned recommends that the Court find that police did not violate Defendant's Fourth Amendment rights by immediately detaining him or keeping him detained for the duration of the search of 16320 Eldamere.

### iv. Independent Basis of Probable Cause

Defendant contends that police lacked an independent basis of probable cause to arrest him. Tr. at 152. Defendant challenged some of the surveillance outlined in the search warrant affidavit, he challenged his connection to 16320 Eldamere, and he challenged his connection to the firearms discovered there. Tr. at 32–40, 80–82, 67–68, 156, 158, 159. Given the foregoing determination that police were entitled to detain Defendant, with the use of handcuffs, incident to the execution of a search for narcotics and firearms, the undersigned finds it unnecessary to determine whether an independent basis of probable cause existed for Defendant's detention.

### v. Questioning

Defendant contends that any statements he made to police should be suppressed because police questioned him after making an improper arrest. Tr. at 159, 160–61; ECF Dkt. # 21 at 11, 12–14. Defendant also made a point of asking Detectives Moran and Alexander if Defendant executed a form or waiver pertaining to his *Miranda* rights. *Id.* at 46, 99, 119. Both detectives indicated that Defendant did not execute such a form or waiver. *Id.*

■ "The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A custodial interrogation occurs when a person has been taken into custody or otherwise deprived of his freedom of action in any significant way and a law enforcement officer questions that person. *Id.* "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

■ A defendant may make a voluntary, knowing, and intelligent waiver of his *Miranda* rights. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. The Government has the burden of proving a waiver by a preponderance of the evidence. *Berghuis v. Thompkins,* —— U.S. ——, 130 S.Ct.

2250, n. 2, 176 L.Ed.2d 1098 (2010). It is insufficient for the Government to merely demonstrate that Defendant made an uncoerced statement. *Id.* at 2261. The Government must also show that Defendant understood his rights. *Id.* In assessing whether Defendant understood his rights, the Court must consider the totality of the circumstances. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

In this case, three instances give rise to scrutiny under *Miranda:* (1) when Detective Moran questioned Defendant on March 24, 2010; (2) when Detectives Moran and Klamert met with Defendant at the jail after his arrest; and (3) when Detective Alexander interviewed Defendant after his arrest. On March 24, 2010, Defendant was in handcuffs and surrounded by police officers. Thereafter, he was detained in jail. Therefore, Defendant was unquestionably detained for all three of these encounters. The undersigned will address each encounter separately to determine if the Government has met its burden of establishing that Defendant waived his *Miranda* rights. *Berghuis,* 130 S.Ct. at n. 2.

██ Detective Moran questioned Defendant on March 24, 2010. However, the record is clear that he made no statements until Detective Moran returned from providing cover at the rear of the house and read Defendant his *Miranda* rights. Tr. at 21, 97, 98, 114–15. Defendant verbally acknowledged that he understood his *Miranda* rights. *Id.* at 21, 98. Detective Alexander asked Defendant if there was anything in the house he [Detective Moran] needed to know about. *Id.* at 21–22, 99. Defendant stated that there were two to three guns in the house. *Id.*

██ Despite Defense Counsel's questioning highlighting the lack of a signed form or waiver regarding Defendant's *Miranda* rights, the record in this case demonstrates adequate evidence to find that Defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. Recently, the United States Supreme Court held that an implicit waiver of the right to remain silent is sufficient to admit a statement into evidence. *Berghuis,* 130 S.Ct. at 2261. If a defendant wants to remain silent, he can say nothing in response to police interrogation, or he can unequivocally invoke his *Miranda* rights and end the interrogation. *Id.* at 2263. The *Berghuis* Court explicitly held that *Miranda* "does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights." *Id.* at 2262. In considering whether Defendant has waived his *Miranda* rights, the Court must consider "two distinct dimensions": (1) the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

Applying the rule of law from *Berghuis* to the case at bar, it is clear that Defendant waived his *Miranda* rights. As in *Berghuis,* there is no evidence in the record that the interrogation in this case was inherently coercive. In fact, the detention leading up to Defendant's questioning was rather brief, and nothing indicates that police used excessive or unreasonable force. As noted above, the Government must also demonstrate that Defendant understood the rights he was waiving. In this case, Detectives Moran and Klamert testified that Defendant explicitly stated that he understood his *Miranda* rights and proceeded to respond to Detective Moran's question. The Sixth Circuit considered a situation similar to the case at bar and held a verbal acknowledgment of an under-

standing of *Miranda* rights to be adequate:

The evidence presented at Moore's suppression hearing established that after Officer Adams orally advised Moore of his *Miranda* rights, Moore stated that he understood them. Moore also agreed to answer Officer Adams' questions without first speaking to attorney. There is nothing in the record to indicate that Moore's will was overborne such that he was coerced into making statements to Officer Adams. Although Moore suggests that his waiver was not knowingly, voluntarily and intelligently made because he did not sign a waiver form listing his rights, he offers no authority, and none can be found, for the proposition that a written waiver is necessary to establish a knowing, intelligent and voluntary waiver of *Miranda* rights.

*See U.S. v. Miggins,* 302 F.3d 384, 397 (6th Cir.2002). Based on Defendant's statement to Detective Moran and the holding in *Miggins,* the undersigned RECOMMENDS that the Court find that no *Miranda* violation occurred when Detective Moran questioned Defendant on March 24, 2010.

■■■■ The analysis pertaining to Detective Moran's subsequent encounter is more complex. Detective Moran did not indicate whether he advised Defendant of his *Miranda* rights when he met with Defendant in the jail. *See* Tr. at 57–58. After police have initially advised an individual of his *Miranda* rights, they are not required to advise him of his *Miranda* rights during each encounter as a matter of course. *Wyrick v. Fields,* 459 U.S. 42, 48–49, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982). The necessity to advise an individual of his *Miranda* rights during subsequent encounters is determined by using a totality of the circumstances test. *Id.* One factor courts consider is whether police or the individual initiated contact. *Id.* Other factors include the amount of time that has passed and if circumstances have "seriously changed." *Treesh v. Bagley,* 612 F.3d 424, 432 (6th Cir.2010). In *Treesh,* the Sixth Circuit determined that no *Miranda* violation occurred when an officer administered a "full arrest warning" at the scene of arrest, and the defendant was questioned at the jail approximately two hours later. *Id.*

■■■■ In the case at bar, Detective Moran and Detective Klamert approached Defendant in lockup. Tr. at 56–57. It is unclear when this visit occurred. *See id.* at 56–60. Any doubt as to whether an accused has waived his *Miranda* rights should be resolved against the Government. *U.S. v. Crowder,* 719 F.2d 166, 174 (6th Cir.1983). Therefore, the totality of circumstances weigh in favor of a *Miranda* violation. There was a change in circumstances since Defendant was last advised of his *Miranda* rights at the scene of the arrest, two detectives approached Defendant in lockup, and the time since he was last advised of his rights is unknown. The holding in *Treesh* is inapplicable because the timing of events is unknown in this case, and the *Treesh* court emphasized the brief period between Treesh's arrest and interrogation. *Treesh,* 612 F.3d at 432. Accordingly, the undersigned RECOMMENDS that the Court GRANT Defendant's motion insofar as it relates to statements he made to Detectives Moran and Klamert in jail. The undersigned will discuss derivative evidence below.

As noted above, Detective Anthony testified that he later met with Defendant and conducted a videotaped interview. Tr. at 118. This meeting occurred one to two days after Detectives Moran and Klamert met with Defendant. *Id.* at 59. He testified that he advised Defendant of his "rights" and Defendant acknowledged that he understood. *Id.* at 119.

In addressing this confrontation, the undersigned is mindful of the immediately preceding recommendation regarding Detectives Moran and Klamert. Irrespective of any *Miranda* violation that they may have committed, *Miranda* warnings can be given to a defendant before a subsequent confession in order to remove the taint of a confession obtained in violation of *Miranda*. *Kordenbrock v. Scroggy*, 919 F.2d 1091(6th Cir.1990) (en banc) citing *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

The undersigned recommends that the Court find that any taint was purged when Detective Anthony again advised Defendant of his rights, a day or two after Detective Moran and Klamert met with him. Tr. at 59, 119; *see supra* § (IV)(25)(a). Additionally, Detective Alexander's reference to "rights" should be considered adequate because the Sixth Circuit has held that the government satisfied its burden under *Miranda* when officers testified that they read a defendant his "constitutional rights." *U.S. v. Mills*, 869 F.2d 1494 (table), 1989 WL 19669 at *2 (6th Cir. Mar. 9, 1989) unreported.

As with the March 24, 2010 confrontation, Defendant's verbal acknowledgment and subsequent response to police questioning is adequate to demonstrate an understanding. Accordingly, the undersigned recommends that the Court DENY Defendant's motion insofar as it relates to questioning by Detective Alexander following Defendant's arrest.

### vi. Search of Defendant's Person

Having determined that police properly detained Defendant, the undersigned RECOMMENDS that the Court find that police properly searched Defendant's person pursuant to the warrant authorizing police to search "any person" at 16320 Eldamere. ECF Dkt. # 21, Ex. A. The undersigned finds it unnecessary to determine whether probable cause existed to believe that Defendant was involved in criminal activity on March 24, 2010. For the forgoing reasons, the undersigned RECOMMENDS that the Court DENY Defendant's motion insofar as it challenges the search of his person.

### vii. Derivative Evidence

As mentioned above, evidence obtained as a result of a Fourth Amendment violation generally must be suppressed at trial. *Wong Sun*, 371 U.S. at 484–85, 83 S.Ct. 407. Even though the undersigned recommends that the Court find an error related to the questioning Detectives Moran and Klamert conducted in the jail following Defendant's arrest, any evidence derived therefrom is nevertheless admissible. *U.S. v. Patane*, 542 U.S. 630, 643, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). This is because *Miranda* rights are a "prophylactic" measure to protect against violations of the Self–Incrimination Clause. *Id.* at 636, 124 S.Ct. 2620. "The Self–Incrimination Clause . . . is not implicated by the admission into evidence of the physical fruit of a voluntary statement." *Id.*

The undersigned will offer one final alternative analysis regarding physical evidence seized from 16320 Eldamere. Had defendant been improperly arrested on March 24, 2010, and assuming he had standing to challenge the seizure of evidence from 16320 Eldamere, the contraband seized inside the home would not be subject to suppression due to the inevitable discovery doctrine. In *U.S. v. Keszthelyi*, 308 F.3d 557 (6th Cir.2002), the Sixth Circuit held that narcotics should not be suppressed if the evidence would inevitably be discovered under a search warrant. The *Keszthelyi* court explained that the United States Supreme Court has recognized an exception to the exclusionary rule for evidence seized in violation of the

Fourth Amendment that inevitably would have been discovered by lawful means. *Id.* at 573–74. "[T]he inevitable discovery exception to the exclusionary rule applies when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." *Id.* quoting *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir.1995), cert. denied, 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996).

In this case, police had a valid, uncontested warrant to search for narcotics, firearms, and other weapons. ECF Dkt. # 21, Ex. A. Detective Moran questioned Defendant shortly after the SWAT team entered the home. Detective Moran testified that two firearms were discovered behind a headboard in the southwest bedroom and one firearm was discovered under the mattress in that room. Tr. at 23–24. There is no reason to believe that detectives would not have discovered these items while executing the search warrant. *See Keszthelyi*, 308 F.3d at 568 ("the cocaine inevitably would have been discovered during the October 11 search [of a defendant's home authorized by a warrant]").

## VI. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned RECOMMENDS that the Court GRANT Defendant's motion insofar as it relates to a custodial interrogation conducted by Detectives Scott Moran and Thomas Klamert in the jail where Defendant was being detained for which the Government failed to introduce evidence that Defendant was properly advised of his *Miranda* rights, but DENY Defendant's

motion in all other respects. ECF Dkt. # 21.